

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-20-00352-CR

William Roy **TATE**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 25th Judicial District Court, Guadalupe County, Texas
Trial Court No. 19-0335-CR-B
Honorable William D. Old, III, Judge Presiding

Opinion by:   Liza A. Rodriguez, Justice

Sitting:      Rebeca C. Martinez, Chief Justice
              Irene Rios, Justice
              Liza A. Rodriguez, Justice

Delivered and Filed: August 11, 2021

AFFIRMED

William Roy Tate appeals his conviction for driving while intoxicated-3rd offense or more

(DWI). *See* TEX. PENAL CODE ANN. §§ 49.04, 49.09(b).  We affirm the trial court's judgment.

### BACKGROUND

Tate was arrested and charged with DWI after a woman called 911 to report an altercation

between a man and a woman inside a vehicle parked in a residential area.  When the responding

officer stopped Tate's vehicle, which was leaving the scene, the officer determined that Tate was

intoxicated.[1]  Tate filed a pretrial motion to suppress challenging the legality of the stop and seeking to suppress the evidence that resulted from his detention.  The trial court conducted a hearing on the motion to suppress on Friday, March 6, 2020.  Trial was set to begin on Monday, March 9, 2020.  At the conclusion of the evidentiary hearing, the trial court verbally denied the motion to suppress and Tate requested findings of fact and conclusions of law and a copy of the hearing transcript.  Tate filed a motion for continuance that afternoon.  The trial court held a hearing on the motion for continuance on Monday morning, but denied it and stated trial would proceed as scheduled.  After a brief recess, Tate expressed his desire to enter a guilty plea pursuant to a plea bargain which included the right to appeal the ruling on his pretrial motion to suppress. The trial court proceeded to administer the plea admonishments to Tate and accepted his plea.  The trial court ordered a presentence report and set the sentencing hearing for June 30, 2020.  Two days before sentencing, Tate filed a motion to withdraw his plea based in large part on denial of the continuance. The trial court heard and denied the motion before proceeding with the sentencing hearing.  In accordance with the plea agreement, Tate was sentenced to ten years' confinement, the sentence was suspended, and he was placed on community supervision for a term of seven years and assessed a $750 fine.  Tate appeals.

## MOTION TO SUPPRESS

In his first issue, Tate argues his investigative detention was not supported by reasonable suspicion and the trial court therefore erred in denying his motion to suppress the evidence obtained as a result of the detention.

---

[1] Tate was also arrested for assault, but the State declined to charge him with assault.

### *Standard of Review*

We review a trial court's ruling on a motion to suppress under a bifurcated standard, reviewing fact-findings for an abuse of discretion and applications of law de novo.  *State v. Ruiz*, 581 S.W.3d 782, 785 (Tex. Crim. App. 2019); *State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017).  In doing so, we afford almost total deference to the trial court's determination of historical facts, especially when it is based on assessment of a witness's credibility, as long as the fact-findings are supported by the record.  *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  We apply the same deferential standard when reviewing the court's ruling on mixed questions of law and fact where resolution of those issues turns on an evaluation of credibility.  *Johnson*, 414 S.W.3d at 192.  We review *de novo* the trial court's application of the law to the facts and its resolution of mixed questions of law and fact that do not depend upon credibility assessments.  *Id.*; *Wade v. State*, 422 S.W.3d 661, 669 (Tex. Crim. App. 2013).  Finally, we view the record in the light most favorable to the trial court's determination and will reverse its ruling only if it was arbitrary, unreasonable, or "outside the zone of reasonable disagreement."  *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014).  When the trial court makes express findings of fact, as it did here, we determine whether the evidence, viewed in the light most favorable to the trial court's ruling, supports the fact findings.  *Johnson*, 414 S.W.3d at 192.

### *Reasonable Suspicion Required for Investigative Detention*

Under the Fourth Amendment, an investigative detention must be justified by a reasonable suspicion.  *Derichsweiler v. State*, 348 S.W.3d 906, 914–15 (Tex. Crim. App. 2011) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013).  An investigative detention occurs when a person is temporarily detained by law enforcement for purposes of an investigation.  *Castro v. State*, 373 S.W.3d 159, 164 (Tex. App.—

San Antonio 2012, no pet.). "A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Derichsweiler*, 348 S.W.3d at 914. It is an objective standard that disregards the actual subjective intent of the detaining officer and focuses instead on whether there was an objectively justifiable basis for the detention. *Id.* "[T]he relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular non-criminal acts." *Id.* (quoting *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997)). The facts need not point to a particular, distinctive criminal offense. *Johnson v. State*, 444 S.W.3d 209, 214 (Tex. App.— Houston [14th Dist.] 2014, pet. ref'd) (facts need only be sufficiently detailed and reliable to suggest something of an apparently criminal nature). A court determines whether reasonable suspicion exists based on the totality of the circumstances. *Derichsweiler*, 348 S.W.3d at 914.

"[T]he detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, 'the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists.'" *Id.* (quoting *Hoag v. State*, 728 S.W.2d 375, 380 (Tex. Crim. App. 1987)). A 911 police dispatcher is considered a "cooperating officer" for purposes of determining reasonable suspicion. *Id.*; *State v. Martinez*, 569 S.W.3d 621, 626 (Tex. Crim. App. 2019) (discussing the collective knowledge doctrine). In addition, a citizen-informant who provides information to police and who identifies himself or herself and can be held to account for the accuracy and veracity of their report may be regarded as reliable. *Derichsweiler*, 348 S.W.3d at 914-15. "In such a scenario, the only question is whether the information that the known citizen-informant provides, viewed through the prism of the detaining officer's particular level of knowledge and

experience, objectively supports a reasonable suspicion to believe that criminal activity is afoot." *Id.* at 915.

### *Suppression Hearing*

The evidence at the suppression hearing consisted of testimony by the 911 caller, Jennifer Brenner, and the detaining officer, Guadalupe County Sheriff's Deputy Wesley Doss, and the admission of the following exhibits: an audio recording of the 911 call; dash-cam video from Deputy Doss's vehicle; a Google map of the residential area; and a series of photographs of dark colored trucks parked in the residential area.

Benner testified that on the evening of September 18, 2018 she heard a woman screaming and saw "arms flailing" inside a vehicle parked near her home in the Las Brisas subdivision; it looked like "two people going at it." She saw the woman get out of the vehicle before it sped away. The vehicle returned shortly thereafter, and the driver yelled at the woman before driving away over some boulders marking the border of a neighbor's yard. At that point, Benner called 911. Benner related the above-stated details to the 911 operator, adding that the woman was crying and distraught, and that "her husband was, I think, beating her." Benner told the 911 operator the woman said "Tate" was the last name of both her and her husband and they lived in the neighborhood. The woman would not answer when asked whether her husband had hit her. When asked whether the woman needed EMS, Benner replied she did not see any obvious marks or injuries but it was dark in the area. According to the 911 recording, Benner described the vehicle as a "dark blue or black Chevy truck, I think." Benner also told the 911 operator the neighborhood was a controlled access, gated community with only one entrance that also served as the exit.

Deputy Doss testified he received a 911 dispatch for "a disturbance in progress" in the Las Brisas subdivision. The dispatcher told Doss the vehicle involved was a dark colored truck and it was currently leaving the scene. Deputy Doss was in the vicinity and arrived at the subdivision in

less than two minutes, at approximately 9:17 p.m. Deputy Doss testified that Las Brisas is a gated, controlled access community for which a resident or invitee needs a code to enter the gate; there is only one entrance and exit. As soon as Doss approached the gate to the subdivision, he saw a dark colored truck exiting the subdivision. He shined the spotlight from his patrol vehicle on the truck to verify that it was dark in color and then turned his patrol vehicle around to follow the truck. Deputy Doss activated his overhead lights and the truck pulled over into a parking lot. According to the dash-cam video and his testimony, Doss told the dispatcher to show him stopped on a "Ford pickup, dark green; I'm not sure if this is the vehicle or not, but it pulled off of Las Brisas." After he stopped the truck, Deputy Doss called in the truck's license plate number. The dash-cam video shows the dispatcher told him the truck was registered to "a Katherine Michelle Tate or a William Roy Tate" and that Tate was the last name of the people involved in the disturbance. At the hearing, Deputy Doss stated he was told the last name of the registered owner was "Kimberly Tate" and "Mr. Tate," and "I had that information prior, and they also told me that it was possibly the subject that was involved in the assault or disturbance." Deputy Doss then exited his vehicle and made contact with the driver of the truck, who identified himself as William Roy Tate. When Deputy Doss asked whether he had been involved in an altercation with his wife, Tate answered, "Yes." Tate also admitted consuming several alcoholic beverages that evening.

At the conclusion of the hearing, the trial court denied the motion to suppress but made no verbal findings. As noted, Tate requested the court make findings of fact and conclusions of law. The trial court's written findings of fact and conclusions of law were filed on July 8, 2020. The court made the following fact-findings:

> a. At approximately 9:08 p.m. on September 18, 2018, Jennifer Benner was arriving home in the Las Brisas subdivision in Guadalupe County, Texas after attending a volleyball tournament for her daughter.

b.  Upon her arrival, Benner noticed a vehicle parked in her cul-de-sac near where people commonly parked to get to a marina.

c.  Benner heard screaming coming from the vehicle, and testified that she saw "arms flailing" inside the vehicle.  Benner stated that it looked like two people "going at it."  Benner saw a female, later identified as Kathleen Tate, exit the vehicle as it was driving away.  Benner reported that the vehicle was accelerating.

d.  After some time, the vehicle, a truck, came back to the scene.  The driver yelled loudly and then turned the truck around quickly.  In his haste, the driver of the truck drove over some boulders that were positioned as a barrier to keep vehicles out of a yard fronting the cul-de-sac.  Benner testified that these boulders were approximately the size of a watermelon if the watermelon were propped up on one end.  Their size was such that the truck briefly bottomed out on the boulders.

e.  During this time, Benner called 911 and spoke with them for approximately sixteen minutes.  She relayed what was happening to the dispatcher, including stating that Kathleen Tate was distraught, that her husband was beating her, and that she was afraid of her husband.  Benner also gave the dispatcher the name of Kathleen and William Tate.  Benner gave a description of the truck, calling it a "dark blue Chevy, I think."

f.  Benner also testified that there is only one entrance and exit to the Las Brisas subdivision.

g.  The 911 dispatcher made a call for a disturbance in progress in the Las Brisas subdivision.  Dispatch also stated that the vehicle was a dark-colored truck and was currently leaving the scene.

h.  Deputy Wesley Doss was in the vicinity, and answered the call of the 911 dispatcher at approximately 9:17 p.m.

i.  From the time he was dispatched, it took Deputy Doss approximately one minute and forty-two seconds to reach the entrance to the Las Brisas subdivision.

j.  As Deputy Doss arrived at the entrance to the Las Brisas subdivision, he saw a dark-colored truck exiting the only exit of the subdivision.  Deputy Doss turned his spotlight on the truck to verify that it was dark in color, and turned his vehicle around to pursue the truck.

k.  Deputy Doss activated his overhead lights and initiated a traffic stop of the vehicle, based on the information he had gotten from the dispatcher, stating that there was a very recent disturbance that had taken place in an area with

controlled access, and that the vehicle matched the description given to the dispatcher.

l.   Deputy Doss stated to the dispatcher that he was not sure if this was the truck, and that it appeared to be dark green in color. Deputy Doss testified that the lighting in the area was dim and sparse.

m.  Deputy Doss ran the license plate on the truck, and dispatch informed him that the registered owner of the truck may have been the individual involved in the disturbance.

n.   Deputy Doss made contact with the driver of the truck and, after asking for his identification, asked the driver if he had been involved in an altercation with his wife. Defendant William Tate answered in the affirmative.

Based on these findings of fact, the trial court made the following conclusions of law:

1.   The court finds that information received from 911 callers can be viewed as reliable if the caller is identified, the caller can be held to account, and the accuracy of the information can be viewed as trustworthy. Information obtained in such a fashion may form the basis for an officer's reasonable suspicion to perform an investigative stop, when viewed through an officer's training and experience. *Derichsweiler v. State*, 348 S.W.3d 906 (Tex. Crim. App. 2011); *Navarette v. California*, 572 U.S. 393 (2014).

2.   The court finds that Ms. Benner's call to 911 was reliable, in that she identified herself, used a 911 system capable of recording the call, and gave specific information to the dispatcher.

3.   The court finds that Deputy Doss had reasonable suspicion to conduct an investigative detention on Tate, based on the information he had gotten from the dispatcher, stating that there was a very recent disturbance that had taken place in an area with controlled access, and that the vehicle matched the description given to the dispatcher.

*Analysis*

The record supports the trial court's findings of fact set forth above, except for minor deviations,[2] and Tate does not challenge the fact-findings on appeal. Tate contends the evidence

---

[2] The record shows Benner's exact statement to the 911 operator was, "her husband was, I think, beating her;" the exact description of the truck provided by Benner to the 911 operator was "a dark blue or black Chevy truck, I think;" and Benner told the 911 operator the last name of the two people involved was "Tate," but she did not know their first names.

fails to support the trial court's conclusion of law that Deputy Doss had reasonable suspicion to conduct the investigative detention because (i) Deputy Doss had no information concerning the occurrence of any criminal activity, and (ii) even if there was criminal activity, Doss had no information connecting Tate to the criminal activity.

With respect to the occurrence of some type of criminal activity, Tate stresses that Deputy Doss was dispatched for a "disturbance" and argues the dispatch was not necessarily for an assault or other criminal offense. Tate also points out that on the 911 call Benner did not expressly say she witnessed an assault and the woman did not state that her husband assaulted her; Benner also did not see any injuries on the woman.[3] During his testimony, Deputy Doss referred to the call he received that night as one for both a "disturbance" and for an "assault," stating "when I was dispatched … it was a disturbance, assault in progress." When questioned about dispatch's use of the term "disturbance," Deputy Doss explained, "I don't think the incident type in our system is titled assault . . . [i]t's titled disturbance." Doss testified he stopped Tate's vehicle to investigate "whether or not an assault had taken place." Moreover, under the collective knowledge doctrine, even if the dispatcher did not tell Deputy Doss all of the details described by Benner to suggest an assault had occurred, the cumulative information known to the cooperating officers at the time of the stop included: "two people going at it;" "arms flailing" inside the truck; the woman screaming and distraught; and Benner reporting, "her husband was, I think, beating her." *See Derichsweiler*, 348 S.W.3d at 914; *Martinez*, 569 S.W.3d at 626. We conclude the evidence developed at the suppression hearing established that Deputy Doss had specific, articulable facts that, when

---

[3] As set forth *supra*, the trial court found that Benner's call to 911 met the requirements to be considered reliable and could support reasonable suspicion for an investigatory stop. Tate does not argue that Benner's 911 call was not reliable or otherwise challenge the trial court's first two conclusions of law.

combined with rational inferences, supported a reasonable suspicion that criminal activity, i.e., an assault, had occurred.

With respect to evidence establishing a connection between Tate and the suspected criminal activity/assault, Benner told the 911 operator the person involved was driving a "dark blue or black Chevy truck," had just driven away from the scene, would have to exit the neighborhood through the sole entrance/exit gate, and had the last name "Tate." This information was passed on to Deputy Doss by the dispatcher and, even if some details were omitted, they were known collectively by the cooperating officers and can be considered in determining whether reasonable suspicion existed. *Derichsweiler*, 348 S.W.3d at 914; *Martinez*, 569 S.W.3d at 626. In his brief, Tate stresses that Deputy Doss told the dispatcher he was "not sure" the vehicle he stopped was the one involved in the disturbance, and he made the investigative stop "to find out whether the driver of that vehicle … was a party to the assault." However, Doss also testified, "[T]hat was prior to them telling me that the registered owner was possibly involved." The evidence showed that, before he approached Tate in his truck, Deputy Doss knew that "Tate" was the last name of the two people involved in the suspected assault and knew that matched the name of the registered owner of the truck. We conclude the evidence established that Deputy Doss had specific, articulable facts that, when combined with rational inferences, lead him to reasonably conclude that the person detained (Tate), had engaged in criminal activity, i.e., an assault.

Based on the totality of the circumstances, as discussed above, we hold the trial court did not err in finding that Deputy Doss had reasonable suspicion to conduct an investigative detention of Tate and did not abuse its discretion in denying Tate's motion to suppress.

### MOTION FOR CONTINUANCE

In his second issue, Tate argues the trial court abused its discretion by denying his motion for continuance on the Monday morning of trial because (i) his counsel did not have sufficient

time to review the transcript of the suppression hearing before trial, and (ii) he was not present in court for the hearing on his motion for continuance. We review a trial court's denial of a motion for continuance under an abuse of discretion standard. *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996); *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007). To prevail on appeal, the defendant must show that he was actually prejudiced by the denial of the continuance. *Heiselbetz v. State*, 906 S.W.2d 500, 511 (Tex. Crim. App. 1995).

The sole ground stated in Tate's motion for continuance and at the hearing was that his counsel needed to review the trial court's written findings of fact and conclusions of law denying the motion to suppress before advising Tate whether to reject the State's plea offer and proceed to trial. The trial court had twenty days to file its findings of fact and conclusions of law. *Melendez v. State*, 467 S.W.3d 586, 590 (Tex. App.—San Antonio 2015, no pet.) (referring to TEX. R. CIV. P. 297). Tate requested the written findings at the motion to suppress hearing on the previous Friday. At the hearing on the motion for continuance, Tate's counsel stated he needed to see the court's findings of fact and conclusions of law first because if he was satisfied with the framing of the suppression issues, then Tate might decide not to proceed with a jury trial. The State objected to the continuance and pointed out, "the concern is for an appellate issue, not a trial issue." The trial court agreed and denied the continuance, stating, "[w]e will go forward, and he can certainly submit the issue of suppression to the jury if it's appropriate … either way we'll be clear for appellate reasons."

In his appellant's brief, Tate asserts the trial court erred in denying his request for continuance on a ground not raised in the trial court — that defense counsel did not have adequate time to review the transcript of the suppression hearing, which counsel received Friday evening after business hours. Tate's counsel never mentioned to the trial court that he needed additional

time to review the transcript of the suppression hearing in order to prepare for trial.[4]  Because Tate's appellate issue does not comport with the ground for continuance presented to the trial court, the issue was not preserved for our review.  *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *Orcasitas v. State*, 511 S.W.3d 213, 220 (Tex. App.—San Antonio 2015, no pet.); *see also* TEX. CODE CRIM. PROC. ANN. art. 29.03 (a criminal action may be continued upon sufficient cause, "which cause shall be fully set forth in the motion").  Even if Tate had preserved the issue for review, he has not shown that he was prejudiced by the short time available to defense counsel to review the transcript.  *Heiselbetz*, 906 S.W.2d at 512 (bare assertion that counsel did not have time to prepare does not establish prejudice).

Tate also argues the trial court erred by holding the hearing on his motion for continuance in his absence.  The record shows that, due to a miscommunication, defense counsel was not aware the trial court planned to hear the motion for continuance at 8:30 a.m., instead of at 9:00 a.m., on the morning of trial.  The trial court talked with the prosecutor on the record about the fact that proceedings always start at 8:30 a.m. in that court before taking a recess.  The transcript resumes after defense counsel is present, but it is not clear what time proceedings resumed.  Defense counsel apologized to the trial court, explaining that both he and his client "had 9:00 o'clock written down." Defense counsel then stated that Tate "should be here shortly," and proceeded to make his argument in support of a continuance.  After hearing the State's argument in opposition, the trial court denied the motion for continuance.  Defense counsel then asked, "[c]an I step out and find out where … my client is?"  After a recess, Tate and his counsel appeared in court and declared he had decided to plead guilty.

---

[4] The transcript of the suppression hearing consists of 60 pages.

In his brief, Tate asserts the trial court violated his statutory right to be present for the pretrial hearing on his motion for continuance. *See* TEX. CODE CRIM. PROC. ANN. art. 28.01, § 1(5) (defendant's presence is required during any pretrial proceeding, including on a motion for continuance); *see also Rushen v. Spain*, 464 U.S. 114, 117 (1983) (defendant's right to be present at all critical stages of trial is a fundamental constitutional right). However, Tate's counsel did not object to the hearing proceeding in Tate's absence; therefore, any error was not preserved for appellate review. TEX. R. APP. P. 33.1(a); *Briggs v. State*, 789 S.W.3d 918, 924 (Tex. Crim. App. 1990) (a party may waive constitutional error by failing to object at trial).

## MOTION TO WITHDRAW GUILTY PLEA

In his last issue, Tate argues the trial court erred in denying his motion to withdraw his guilty plea before sentencing. Tate asserts his plea was involuntary because the unexpected denial of his motion for continuance forced him to make a "hasty decision" to plead guilty to avoid proceeding to trial without adequate time for his counsel to review the suppression transcript and findings. He also contends that, because the trial court ruled on his motion for continuance without him present, he lost faith that he would receive a fair trial.

A defendant may withdraw his plea at any time before judgment is pronounced or the case has been taken under advisement. *Watson v. State*, 974 S.W.2d 763, 765 (Tex. App.—San Antonio 1998, pet. ref'd) (citing *Jackson v. State*, 590 S.W.2d 514, 515 (Tex. Crim. App. 1979)). Once the judge has admonished the defendant, received his plea, and received evidence, passing the case for a presentence investigation constitutes "taking the case under advisement." *Id.* Once the case has been taken under advisement, the decision whether to allow the defendant to withdraw his plea is within the sound discretion of the trial court. *Id.*; *Jackson*, 590 S.W.2d at 515.

Here, Tate filed the motion to withdraw his guilty plea two business days before his sentencing hearing, after the court had accepted his plea and ordered a presentence report.

Therefore, we review the trial court's denial of Tate's motion to withdraw his plea for an abuse of discretion. *Watson*, 974 S.W.2d at 765. To establish an abuse of discretion, Tate must show that the trial court's ruling falls outside the "zone of reasonable disagreement." *Id.*

The appellate record does not contain the transcript of a hearing on Tate's motion to withdraw his plea or the sentencing transcript. An affidavit signed by Tate was attached to his motion to withdraw his plea. In the affidavit, Tate states he was "shocked" to find out when he arrived for court Monday morning that not only had the hearing been conducted in his absence, but the continuance had been denied; he was "extremely concerned" about his lawyer being prepared for trial because he had just recently received the transcript and had not yet received the findings of fact and conclusions of law; and he was worried that his lawyer would not be able to effectively defend him. Tate states he was informed the trial court needed him to either enter a guilty plea or proceed to trial immediately, but he had not yet discussed final terms of a plea bargain with the State. Tate concludes, "I felt pressured from the Court to enter the guilty plea and felt I had no other choice, because it was between a guilty plea or a trial that we would not be prepared for." Tate's affidavit does not state that he would have presented any testimony at the continuance hearing, or would have added anything further to the grounds presented by his counsel.

Despite Tate's statement that he felt rushed into a making a decision due to denial of the continuance, the record of the plea hearing reflects that a recess was taken so that Tate could consult with his counsel and the prosecutor. When proceedings resumed, defense counsel stated Tate had decided to plead guilty. The trial court properly admonished Tate, and Tate judicially confessed he was guilty of the charged offense and affirmed that he understood the waivers and consequences of his plea; Tate also signed the written admonishments and waivers and affirmed they were made freely and voluntarily. *See* TEX. CODE CRIM. PROC. ANN. art. 26.13(a).

Substantial compliance with the admonishments creates a prima facie showing that the defendant entered his guilty plea knowingly and voluntarily. *De Luna v. State*, No. 04-07-00424-CR, 2008 WL 1882788, at *2 (Tex. App.—San Antonio April 30, 2008, no pet.) (mem. op., not designated for publication) (citing *Aguirre-Mata v. State*, 125 S.W.3d 473, 479-80 (Tex. Crim. App. 2003)). The burden then shifts to the defendant to prove that he did not understand the consequences of his plea and the acceptance of the plea constitutes harm. *Id.*; *Eatmon v. State*, 768 S.W.2d 310, 312 (Tex. Crim. App. 1989). A defendant who attests during the initial plea hearing that his plea is voluntary bears a "heavy burden" to prove in a subsequent hearing that he entered the plea involuntarily. *Coronado v. State*, 25 S.W.3d 806, 809 (Tex. App.—Waco 2000, pet. ref'd). Tate supplied no evidence to the trial court to rebut the presumption of a voluntary plea created by the admonishments and his acknowledgments that he was pleading guilty voluntarily and knowingly. Tate does not claim he is innocent, or that he did not understand the consequences of his plea, or that he was induced by promises or coerced by force or threat into entering the plea. *See Brady v. United States*, 397 U.S. 742, 755 (1970); *Ex parte Williams*, 704 S.W.2d 773, 781 (Tex. Crim. App. 1986) (plea coerced by threat or force is involuntary). Tate received the sentence agreed to in his plea agreement with the State. Based on the record before us, we conclude the trial court did not abuse its discretion in denying Tate's motion to withdraw his plea.

## CONCLUSION

Based on the foregoing reasons, we affirm the trial court's judgment.

Liza A. Rodriguez, Justice

DO NOT PUBLISH

- 15 -